STATE OF MINNESOTA                          DISTRICT COURT

COUNTY OF HENNEPIN                          FOURTH JUDICIAL DISTRICT
                                            Case Type: Personal Injury

FILED
MINNEAPOLIS, MN
2018 JUN -4 PM 12: 27
CITY CLERK
DEPARTMENT

| | |
|---|---|
| DeAngelo Parker; Regina Coleman, Chiquita Thomas; Gregory Coleman; Ksean Ewing; Maurice Robison; Percy Robison; Regina Coleman, as guardian, o/b/o Renetta Robison, ward and protected person; and Chiquita Thomas, as guardian, o/b/a D'Shawna Patterson, a minor. | Court File No. _____  <br><br> **COMPLAINT** <br><br> **Jury trial demanded** |
| Plaintiffs, | |
| v. | |
| Matthew Clark, Scott Gerlicher, Bruce Folkens, Michael Friestleben, James Novak, David Gray, Clinton Letch, David Mathes, Charles Adams, Jonathan Kingsbury, Nicolas Torborg, Cory Taylor, Christopher Cushenbery, Adam Hakanson, Grant Johnson, Mark Kaspszak, Oscar Macias, George Judkins, Cole Peterson, Joseph Klimmek, Blayne Lehner, Michael Nordin, and John Does 1-20, and Jane Does 21-40, personally, individually, in their capacity as Minneapolis police officers and agents, and the City of Minneapolis, | |
| Defendants. | |

Come now, the Plaintiffs (DeAngelo Parker; Regina Coleman, Chiquita Thomas;

Gregory Coleman; Ksean Ewing; Maurice Robison; Percy Robison; Regina Coleman,

as guardian, o/b/o Renetta Robison, ward and protected person; and Chiquita Thomas,

1

EXHIBIT 2

as guardian, o/b/a D'Shawna Patterson, a minor) ("Plaintiffs"), and as and for their Complaint against the Defendants, they state and allege as follows:

## INTRODUCTION

1. This is an action for money damages and declaratory relief brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth Amendment to the United States Constitution as made applicable to the states pursuant to the Fourteenth Amendment to the United States Constitution, and under the common and statutory law of the State of Minnesota, against Defendants, Minneapolis police officers and agents, in their individual and official capacities, and against the City of Minneapolis.

2. While Defendants were in the process of responding to a shooting of Jordan Davis ("Davis"), a Minneapolis police officer, next door to the home where Plaintiffs were living, Defendants planned to seize, arrest, and detain Plaintiffs even though Plaintiffs had no connection to, or involvement with, the shooting. Then, although Defendants knew that there was no exception to the warrant requirement which would allow them to orchestrate their plan, they seized, arrested, and detained Plaintiffs.

3. Former United Stated Supreme Court Justice Stewart wrote in *Ybarra v. Illinois*, 444 U.S. 85 (1979) that "a person's mere propinquity to others independently suspected of criminal activity" is not an exception to the warrant requirement set forth in the United States Constitution. In other words, the Constitution does not permit guilt by association. In this case, the City of Minneapolis Police Department not only ignored that rule, but in the absence of even an association between Plaintiffs and the shooting perpetrator, other than that Plaintiffs lived next door to the victims of the criminal

EXHIBIT 2

wrongdoing which led to Officer Davis being called to the scene where he was shot, Defendants nevertheless treated Plaintiffs like criminals.

4. Defendants had no reasonable articulable suspicion, no probable cause, no exception to the warrant requirement, and no justification to support their substantial interference with Plaintiffs' constitutionally-protected liberties.

## PARTIES

5. Plaintiffs are all residents of the City of Minneapolis, and were, at the time of the occurrences set forth in this Complaint, residents of the City of Minneapolis. On the night of February 20 to February 21, 2015, Plaintiffs were all residents or guests at 1122 24th Avenue North, in Minneapolis ("Plaintiffs' Residence").

6. Defendant Matthew Clark ("Clark") was at all times relevant to the occurrences set forth in this Complaint an Assistant Chief for the Minneapolis Police Department ("MPD").

7. Defendant Scott Gerlicher ("Gerlicher") was at all times relevant to the occurrences set forth in this Complaint a Commander for the MPD.

8. Defendant Bruce Folkens ("Folkens") was at all times relevant to the occurrences set forth in this Complaint a Commander for the MPD.

9. Defendant Michael Friestleben ("Friestleben") was at all times relevant to the occurrences set forth in this Complaint a Lieutenant, and Inspector, for the MPD.

10. Defendant James Novak ("Novak") was at all times relevant to the occurrences set forth in this Complaint a Lieutenant for the MPD.

11. Defendant David Gray ("Gray") was at all times relevant to the occurrences set forth in this Complaint a Sergeant for the MPD.

EXHIBIT 2

12. Defendant Clinton Letch ("Letch") was at all times relevant to the occurrences set forth in this Complaint a Sergeant for the MPD.

13. Defendant David Mathes ("Mathes") was at all times relevant to the occurrences set forth in this Complaint a Sergeant for the MPD.

14. On information and belief, Clark, Gerlicher, Folkens, Friestleben, Novak, Gray, Letch, and Mathes composed the leadership team ("Leadership Team") with respect to the response to the shooting of Davis, and were responsible for initially making the decisions to treat Plaintiffs in the manner in which Plaintiffs were treated by Defendants as set forth in this Complaint.

15. On information and belief, although they had no basis for interfering with Plaintiffs' liberty other than the misdirection of the leadership group, the remaining Defendants participated in the mistreatment of Plaintiffs as set forth herein.

16. Defendant Charles Adams ("Adams") was at all times relevant to the occurrences set forth in this Complaint a Sergeant for the MPD.

17. Defendant Jonathan Kingsbury ("Kingsbury") was at all times relevant to the occurrences set forth in this Complaint a Lieutenant for the MPD.

18. Defendant Nicholas Torborg ("Torborg") was at all times relevant to the occurrences set forth in this Complaint a Sergeant for the MPD.

19. Defendant Cory Taylor ("Taylor") was at all times relevant to the occurrences set forth in this Complaint an officer for the MPD.

20. Defendant Christopher Cushenbery ("Cushenbery") was at all times relevant to the occurrences set forth in this Complaint an officer for the MPD.

EXHIBIT 2

21.  Defendant Adam Hakanson ("Hakanson") was at all times relevant to the occurrences set forth in this Complaint an officer for the MPD.

22.  Defendant Grant Johnson ("Johnson") was at all times relevant to the occurrences set forth in this Complaint an officer for the MPD.

23.  Defendant Mark Kaspszak ("Kaspszak") was at all times relevant to the occurrences set forth in this Complaint an officer for the MPD.

24.  Defendant Oscar Macias ("Macias") was at all times relevant to the occurrences set forth in this Complaint an officer for the MPD.

25.  Defendant George Judkins ("Judkins") was at all times relevant to the occurrences set forth in this Complaint an officer for the MPD.

26.  Defendant Cole Peterson ("Peterson") was at all times relevant to the occurrences set forth in this Complaint an officer for the MPD.

27.  Defendant Joseph Klimmek ("Klimmek") was at all times relevant to the occurrences set forth in this Complaint an officer for the MPD.

28.  Defendant Blayne Lehner ("Lehner") was at all times relevant to the occurrences set forth in this Complaint an officer for the MPD.

29.  Defendant Michael Nordin ("Nordin") was at all times relevant to the occurrences set forth in this Complaint an officer for the MPD.

30.  John Does 1-20 and Jane Does 21-40 are individuals who were employed by the MPD and/or City of Minneapolis on about February 21, 2015, and who directly participated, or oversaw, the treatment of the Plaintiffs. Their identities are either unknown to Plaintiffs, or the Plaintiffs are aware of their identities but not sufficiently

EXHIBIT 2

aware of the scope of their involvement with respect to the treatment of Plaintiffs. Their identities will be disclosed in an amended pleading upon discovery of those identities.

31. Defendant City of Minneapolis ("City") is a municipality in the State of Minnesota, and was, at the time of the occurrences set forth in this Complaint, the employer of the other Defendants.

## ALLEGATIONS COMMON TO ALL COUNTS

32. Early in the morning, at about 4:54 a.m. on February 21, 2015, while Davis was responding to a domestic disturbance at property located at 1118 24th Avenue North, in north Minneapolis, MN ("Shooting Location"), Andrew Neal ("Neal") shot Davis in the shoulder.

33. The Shooting Location sits next to, and to the east of, the place where Plaintiffs were staying that early morning of February 21, i.e., Plaintiffs' Residence.

34. Davis, together with Officers John Murphy, Jason Wolff and Michael Moore, had responded to the Shooting Location, in response to a 4:20 a.m. dispatch call related to Neal. Neal had broken into the Shooting Location angry at his ex, who lived there with children including Neal's, and upon entrance, Neal had brandished a hammer at the residents before one of them chased him away.

35. At 4:44 a.m., on information and belief over twenty minutes after the dispatch call, Davis, Murphy, Moore and Wolff arrived. They cleared the scene shortly thereafter, but as they were leaving, at about 4:54 a.m., Davis was shot by Neal, who had returned with a gun.

36. Davis was taken to the hospital for treatment and was released later that day.

EXHIBIT 2

37. As Davis was being transported to the hospital, at 4:55 a.m. on February 21, 2015, the shooting was aired on police radio, and within a few minutes, approximately forty-five (45) Minneapolis police officers were available to assist at the scene of the shooting. Close to one hundred (100) police officers were involved in the course of trying to apprehend Neal, who was apprehended shortly after 1:00 p.m. in the afternoon that same day.

38. In an effort to show the predominately Black residents of north Minneapolis -- whether guilty of, or legitimately suspected of, any criminal conduct or not -- the force which the MPD will bring upon them if any harm is done to any MPD officer, Defendants planned to seize, arrest, and detain the innocent Plaintiffs and hold them in a bus until Neal was apprehended.

39. The message which the MPD wanted to deliver to Plaintiffs and others living in north Minneapolis, and the message which was delivered, is that the liberty and freedom of the population in north Minneapolis, which is supposed to be protected by the United States and Minnesota Constitutions like the liberty and freedom of those living in more affluent and whiter neighborhoods, may be disregarded at the whim and caprice of the MPD, including when the MPD wants to show what it can do to innocent people if someone else causes any harm to an officer in the MPD.

40. As they arrived at the scene of the shooting, outside the Shooting Location, the dozens of responding members of the MPD set up inner and exterior perimeters around the Shooting Location, as directed by the Leadership Team. At the same time, the Leadership Team assigned roles and set up a Command Post ("CP") at

EXHIBIT 2

the nearby North Star Elementary School, led initially by Defendants Novak and then Clark.

41.     By 5:45 a.m., Clark contacted Defendant Kingsbury to assemble SWAT officers to form teams. By the time Kingsbury arrived at the CP at about 6:30 a.m., SWAT officers were arriving, including Defendants Torborg, Taylor, Cushenbury, Hakanson, Johnson, Kaspszak and Macias, and that team of Defendants ("Swat Team Defendants"), including Kingsbury, then assembled to order that the occupants of the Shooting Location and the Plaintiffs' Residence to come out of their homes.

42.     Before all the SWAT Team Defendants were assembled, some occupants of the Shooting Location and the Plaintiffs' Residence came out of those residences and were placed into custody.

43.     The only two adult residents of the Shooting Location, together with one minor, who were all innocent of any criminal wrongdoing related to the shooting, emerged before 5:45 a.m., on information and belief. They were Alisha Washington and Charles Haynes, Jr., as well as one of Washington's minor children. After they came out of the home, all persons remaining in Shooting Location were innocent minor children. On information and belief, Defendants were aware of these facts.

44.     At approximately 6:00 a.m., Plaintiff Chiquita Thomas emerged from the Plaintiffs' Residence, and she was detained by Defendant Judkins, with the assistance of Defendant Peterson, questioned by Defendants Judkins and Letch, transported to the CP by Defendant Klimmek, and thereafter held in a squad car and later a bus. At that time, based on the questioning of Thomas, Defendants were aware that there were adults and children remaining in Plaintiffs' Residence.

EXHIBIT 2

45. After approximately 7:30 a.m., still on February 21, 2015, the SWAT Team Defendants referenced above ordered the remaining Plaintiffs out of Plaintiffs' Residence. Some were cuffed, all were placed into squad cars, and all were ultimately detained in a bus where they were held against their will until the afternoon, between 1:00 and 2:00 p.m., after Neal had been apprehended and arrested over one mile from the scene of the shooting.

46. Plaintiffs Gregory Coleman and Ksean Ewing emerged from the Plaintiffs' Residence first and were ordered to the ground and handcuffed, and they were then initially held in a MPD squad vehicle.

47. Plaintiffs Percy and Maurice Robison were initially held in a separate squad vehicle.

48. Plaintiff DeAngelo Parker and Plaintiff Renetta Robison were initially held in separate squad vehicle.

49. Plaintiff Regina Coleman and Plaintiff D'Shawna Patterson were initially held in a separate squad vehicle.

50. Plaintiff Chiquita Thomas, as set forth above, had emerged earlier and was already detained in a separate squad vehicle.

51. All of the Plaintiffs were detained in squad vehicles for approximately one hour from when the Plaintiffs other than Chiquita Thomas were ordered from the Plaintiffs' Residence.

52. On information and belief, Defendants searched Plaintiffs' Residence, and then Defendants Nordin and Lehner inhabited and held said residence after the SWAT team entry and until approximately 12:04 p.m., when they cleared from the scene.

EXHIBIT 2

53. After the Defendants searched the Plaintiffs' Residence and found it to be clear, Defendants then transported Plaintiffs in the MPD squad cars to the CP. On information and belief, the Leadership Team had arranged for a bus to be brought to the CP with the intent that the Plaintiffs would continue to be detained at the CP in the bus. Once they were transported to the CP, Plaintiffs were in fact detained in the bus.

54. Once on the bus, despite repeatedly asking, Plaintiffs were not told the reason why they were detained. Plaintiffs were cold, without blankets, and because of the quick exit from the Plaintiffs' Residence, Renetta Robison did not have shoes. Plaintiffs requested food and blankets repeatedly, but it was hours before either food or blankets were provided.

55. At approximately 10:30 a.m., Plaintiff DeAngelo Parker was removed from the bus and taken to be interviewed by Defendant Charles Adams, all while still being detained. It was only after he returned from that interview, at around 11:00 a.m., that Plaintiffs were provided with anything to eat or any blankets.

56. By the time Plaintiffs were released from the bus, on information and belief, Neal had been apprehended. Plaintiffs asked to be transported back to Plaintiffs' Residence upon said release, but the MPD officers told them they needed to walk back. Neighborhood members ended up driving some of the Plaintiffs home, including Renetta, who had no shoes.

57. The actions of Defendants, including Nordin and Lehner, also caused damage to the property of Plaintiffs, who were forced to expend resources on tools, cleaning supplies, and materials to fix a broken door frame which Defendants created upon entry as well as clean up debris and filth left behind by Defendants.

EXHIBIT 2

58.  On information and belief, Neal had left the scene of the shooting around 4:55 a.m. and had never returned, and he had been in the area of the 1119 Logan Avenue North, approximately 1.5 miles south of the Shooting Location, since at least 9:00 a.m.

59.  The City of Minneapolis and MPD was aware, at least as early as 9:08 a.m., via a cell phone "ping," that Neal was in the vicinity of 1119 Logan Avenue North.

60.  The efforts to "ping" Neal's phone began before 8:00 a.m. on February 21, 2015.

61.  On information and belief, Defendants and the MPD never had probable cause, or any reasonable articulable suspicion, that Neal was in Plaintiffs' Residence, or anywhere within the perimeter which was established around the Shooting Location, within minutes after 4:55 a.m., and certainly before Plaintiffs were ordered out of Plaintiffs' Residence.

62.  Defendants and the MPD had no more reason to believe that Neal was in either the Shooting Location or Plaintiffs' Residence than that he was in any other home within the perimeter, or any other place within traveling distance of the Shooting Location.

63.  If Defendants claim to have had any probable cause or reasonable articulable suspicion, or other suspicion that Neal was in the Shooting Location after 5:45 a.m. on February 21, 2015, then they must claim that they maintained that cause or suspicion while knowing that the Shooting Location was otherwise inhabited by all innocent minors.

EXHIBIT 2

64. If Defendants claim to have had any probable cause or reasonable articulable suspicion, or other suspicion that Neal was in Plaintiffs' Residence, after 6:00 a.m. on February 21, 2015, upon speaking to Plaintiff Thomas, then they must claim that they maintained that cause or suspicion while knowing that Plaintiffs' Residence was otherwise inhabited by innocent persons including minors.

65. Before the SWAT team led by Kingsbury worked to clear Plaintiffs' Residence and the Shooting Location, Defendants had the cell phone number of Neal and were pursuing leads to locate him outside the perimeter which MPD established around the Shooting Location.

66. At about 9:00 a.m., Defendants began composing two SWAT teams, 1280 and 1281, with which to approach Neal's location.

67. On information and belief: After conducting surveillance in the neighborhood of 1119 Logan Avenue north from 9:00 a.m. to 12:30 p.m. on February 21, 2015, the MPD made the decision to advance upon 1119 Logan Avenue with two SWAT teams, and after those teams advanced shortly after 1:00 p.m., MPD officers took Neal into custody.

68. Only then, in the afternoon of February 21, 2015, did the Defendants release Plaintiffs from custody.

69. Defendants never had any legitimate or legal basis to support the removal of Plaintiffs from Plaintiffs' Residence, the search of Plaintiffs' Residence, or the continued detention of Plaintiffs after they were removed from Plaintiffs' Residence.

70. Defendants never had a warrant which allowed them to arrest, detain, or search the person, property, or home of Plaintiffs.

EXHIBIT 2

71. Defendants had ample time to apply for a warrant and obtain a warrant, if permitted, during the two plus hours between 4:55 a.m. and the time when they forced Plaintiffs from Plaintiffs' Residence.

72. Despite having ample time, Defendants neither applied for nor obtained a warrant which allowed Defendants to interfere with Plaintiffs' liberty.

73. Even if Defendants had, or could have had, with a warrant, some legitimate or legal basis for removing Plaintiffs from their home or searching their home, no such basis existed after Plaintiffs were removed and the home was searched. In other words, by 8:00 a.m. on February 21, 2015, no such basis could have existed.

74. Yet, Defendants continued to detain Plaintiffs against their will for hours.

75. Plaintiffs were even detained at the scene after officers were being relieved from the scene surrounding the Shooting Location between 12:00 p.m. and 1:00 p.m. on February 21, 2015, because MPD was focused on moving on 1119 Logan Avenue to get Neal.

76. At no point did any Defendant have any reasonable articulable suspicion or probable cause that any Plaintiff had engaged in any criminal act.

77. To the extent that any Defendant at any point could have had any reasonable articulable suspicion or probable cause that any Plaintiff had engaged in any criminal activity, it was dispelled upon questioning.

78. For example, Defendants detained and interviewed Plaintiff Thomas at about 6:00 a.m. on February 21, 2015, and after that interview Defendants did not have any reasonable articulable suspicion or probable cause that any Plaintiff had engaged in any criminal activity, or that Neal was in Plaintiffs' Residence.

EXHIBIT 2

79. Defendant Adams detained and questioned Plaintiff Parker at about 10:28 a.m. on February 21, 2015, and after that interview Defendants did not have any reasonable articulable suspicion or probable cause that any Plaintiff had engaged in any criminal activity, or that Neal was in Plaintiffs' Residence at any time on February 21, 2015.

80. Nevertheless, following questioning, Defendants continued to detain Plaintiffs.

### COUNT I (Violation of 42 U.S.C. § 1983 - Unreasonable Search and Seizure)

81. Plaintiffs incorporate herein by reference all previous paragraphs of the Complaint as if set forth fully herein.

82. By their actions, Defendants, under color of state law, violated and deprived Plaintiffs of their clearly established and well-settled civil rights to be free from unreasonable search and seizure.

83. Defendants subjected Plaintiffs to this deprivation of their rights either maliciously or by acting with reckless disregard for whether Plaintiffs' rights would be violated by Defendants' actions.

84. Defendants cannot articulate an exception to the warrant requirement which would be applicable to the circumstances under which Plaintiffs were seized, searched, and detained.

85. As a direct and proximate result of the acts and omissions of Defendants, Plaintiffs suffered permanent injury, were forced to endure and will in the future suffer bodily and/or mental harm, and are thereby damaged in an amount in excess of $50,000.00 as will be proved at trial.

EXHIBIT 2

### COUNT II (Violation of 42 U.S.C. § 1983 - Excessive Force)

86. Plaintiff incorporates herein by reference all previous paragraphs of the Complaint as if set forth fully herein.

87. As Defendants had no basis for using any amount of force against Plaintiffs, but did use force in seizing, searching, and detaining Plaintiffs, such force was excessive and unreasonable.

88. By their actions, Defendants, under color of state law, violated and deprived Plaintiffs of their clearly established and well-settled civil rights to be free from excessive force.

89. Defendants subjected Plaintiffs to this deprivation of their rights either maliciously or by acting with reckless disregard for whether Plaintiffs' rights would be violated by their actions.

90. As a direct and proximate result of the acts and omissions of Defendants, Plaintiffs suffered permanent injury, were forced to endure and will in the future suffer bodily and/or mental harm, and are thereby damaged in an amount in excess of $50,000.00 as will be proved at trial.

### COUNT III (Trespass)

91. Plaintiffs incorporate herein by reference all previous paragraphs of the Complaint as if set forth fully herein.

92. Plaintiffs had rights of possession of Plaintiffs' Residence, as well as to the personal property within that real property.

EXHIBIT 2

93. Defendants wrongfully and unlawfully entered the real property and otherwise intentionally interfered with Plaintiffs' possessory rights to real and personal property.

94. As a direct and proximate result of Defendants' interference with Plaintiffs' possessory rights, Plaintiffs have been damaged in amount to be proved at trial, for the costs of repairing the damages caused by Defendants, including materials, labor, and tools, in an amount between $200 and $2,000.00 dollars.

### COUNT IV (UNCONSTITUTIONAL TAKING)
### In the alternative to Counts I-III

95. Plaintiffs incorporate herein by reference all previous paragraphs of the Complaint as if set forth fully herein.

96. To the extent Defendants were justified in entering and causing damage to the property of Plaintiffs, such justification being that such damage was in furtherance of some public purpose, the damage was a taking for a public purpose without just compensation first paid in violation of the Minnesota and United States Constitutions.

97. As a direct and proximate result of Defendants' interference with Plaintiffs' possessory rights, Plaintiffs have been damaged in amount to be proved at trial, for the costs of repairing the damages caused by Defendants, including materials, labor, and tools, in an amount between $200.00 and $2,000.00 dollars.

### COUNT V (Conspiracy)

98. Plaintiffs incorporate herein by reference all previous paragraphs of the Complaint as if set forth fully herein.

99. Defendants conspired with one another to deprive Plaintiffs of their constitutional rights as described herein.

EXHIBIT 2

100. As a direct and proximate result of the acts and omissions of Defendants, Plaintiffs suffered permanent injury, were forced to endure and will in the future suffer bodily and mental harm, and are thereby damaged in an amount in excess of $50,000.00 as will be proved at trial.

101. Defendants are jointly and severally liable for all damages caused to Plaintiffs set forth herein.

### COUNT VI (Respondeat Superior/Vicarious Liability)

102. Plaintiffs incorporate herein by reference all previous paragraphs of the Complaint as if set forth fully herein.

103. Pursuant to Minn. Stat. § 466.02, as well as the doctrine of respondeat superior as the employer of Defendants, Defendant City of Minneapolis is liable for the acts the other Defendants set forth herein.

### COUNT VII (*Monell* Claim)

104. Plaintiffs incorporate herein by reference all previous paragraphs of the Complaint as if set forth fully herein.

105. On information and belief, Defendant City has failed to properly train, supervise and/or discipline the remaining Defendants. The unconstitutional and illegal actions of Defendants were carried out pursuant to an unconstitutional policy, procedure or practice of the City, as executed by the remaining Defendants, in violation of Plaintiffs' constitutional rights.

106. On information and belief, the unconstitutional policies of the Defendant City included the policy, custom, and procedure of failing to train officers to on

EXHIBIT 2

exceptions to the warrant requirement, and even to disobey the warrant requirement, and this resulted in the violation of Plaintiffs' constitutional rights.

107. As a direct and proximate result of the negligent, intentional, or unconstitutional policies of the City, Plaintiffs suffered and will suffer damages in an amount in excess of $50,000.00 as will be proved at trial.

## COUNT VIII (Declaratory Judgment)

108. Plaintiffs incorporate herein by reference all previous paragraphs of the Complaint as if set forth fully herein.

109. The courts in Minnesota have the power to declare the rights of persons under the United States and Minnesota Constitutions, whether pursuant to Chapter 555 of the Minnesota Statutes, the "Uniform Declaratory Judgments Act," or pursuant to the federal Declaratory Judgment Act, 28. U.S.C. § 2201.

110. Plaintiffs are entitled to a declaratory judgment that the Defendants violated their constitutionally protected rights, as alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, following a jury trial which is hereby demanded, as follows:

A. Declaring and adjudging the Defendants violated the law as complained of herein;

B. Awarding damages to Plaintiffs in an amount in excess of $50,000.00 as will be proved at trial, together with prejudgment interest;

C. Awarding Plaintiffs their costs, disbursements, and reasonable attorney fees;

EXHIBIT 2

D. Requiring all Defendants to issue an apology to Plaintiffs;

E. For such further and additional relief as may be just and equitable; and

F. For a jury trial, which is hereby demanded.

**FERDINAND F. PETERS, ESQ. LAW FIRM**

Dated: 5-30-18

By: _____
Ferdinand F. Peters (#157041)
Benjamin Loetscher (#0389037)
Lakes and Plains Office Building
842 Raymond Ave., Suite 200
St. Paul, MN 55114
Telephone: (651) 647-6250
Fax: (651) 251-1183
ferdpeters@ferdlaw.com
bloetscher@ferdlaw.com
**Attorneys for Plaintiffs**

## ACKNOWLEDGMENT

The undersigned hereby acknowledges section 549.211 of the Minnesota Statutes, and its effect.

Dated: 5-30-18

By: _____
Benjamin Loetscher

EXHIBIT 2